HAMMONTREE v. COBB CONST. CO.

(Division B. Jan. 22, 1934.)

[152 So. 279. No. 30940.]

**Wilbourn, Miller & Wilbourn,** of Meridian, for appellant.

846

**Gilbert & Cameron,** of Meridian, for appellee.

Argued orally by **R. E. Wilbourn**, for appellant, and by **V. W. Gilbert**, for appellee.

**Griffith, J.**, delivered the opinion of the court.

Appellee is engaged in general road construction work and on the occasion in question was laying a concrete public highway, twenty feet wide, from the Alabama line westward towards the city of Meridian. The principal machine used in this work is a large concrete mixer into which is fed, every minute and a quarter, a batch of material consisting of seven sacks of concrete, one thousand four hundred pounds of sand, and two thousand seventy

pounds of gravel. This mixer is placed in the middle of the twenty foot space to be paved, and, as the mixer deposits the mixed paving material upon the subgrade, there to be properly spread by the curing or finishing crew, the mixer, by means of a tractor device with which it is equipped, progressively recedes from the laid pavement and in the direction towards which the work is progressing. The subgrade over which the mixer recedes, or more properly speaking progresses, is, of course, prepared in advance, and the highway commission requires the advance preparation of the subgrade to be in a finished condition, all properly leveled and rolled by a five-ton roller, and with steel forms in accurate and final position twenty feet apart on each side, for at least three hundred feet ahead of the mixer. The batches of material are brought to the mixer by large motor trucks, which back up to the mixer and dump their loads into the receiving scoop of the mixer. Because of the necessary size and length of the trucks, they cannot turn around at the mixer, nor can they back in near the mixer, for this would dislocate the steel forms on the side which at that location must be kept absolutely in true and accurate position.

This necessitates that at an available place ahead of the mixer, and, if possible beyond the three-hundred-foot finished subgrade, there shall be provided a turn in for the trucks, that is to say, a place where the trucks can turn around, back into an opening in the forms, and thus get between the forms and upon the twenty-foot prepared roadway, and thence back down to the mixer, whence, when the load is dumped into the mixer, the trucks proceed driving forward on their then right-hand side of the twenty-foot roadway to the turn in, and there make their exit. In backing down to the mixer, the truck driver is required to keep his truck on the right-hand side of the road as relates to the direction towards which the truck is then backing, and to see to it that he does not drive

against the outside forms which must not be there disturbed, and to constantly blow his horn while backing. This requires that the truck driver constantly look back over his left shoulder and on that side, which, of course, prevents him from seeing what is on the other side. A large fleet of trucks was necessary and that one should back down to the mixer on an average of every minute and a quarter. Eighteen of these trucks were in busy operation on the day in question, and, at the time of the accident, the turn in was about four hundred feet from the mixer.

Appellant's decedent was the foreman in charge of the subgrade crew working ahead of the mixer and had been engaged in this character of work for three or more years. On the occasion here under review, he had gone down along the roadway between the turn in and the mixer, and, at a point about one hundred fifty feet from the mixer, he stepped into the twenty-foot roadway and called the attention of a worker there to some defect in the subgrade to be corrected, and then stepped over just beyond the center of the prepared roadway and into the edge of that space used by the backing trucks. One of the backing trucks had just passed him as he did so, and another was backing down towards the place where the decedent had stopped; and, apparently oblivious of his situation, he was looking towards the mixer when he was struck by the truck last mentioned and was so severely injured that his death soon followed. Other facts will be mentioned later in this opinion, in their pertinent connection. Suit was brought against the contractor to recover for the injury and death, and a peremptory instruction of no liability was granted by the trial court.

It is not claimed that, strictly speaking, the place to work was within itself an unreasonably dangerous place; nor that the machinery and appliances were unsuitable or unsafe, nor that there was any negligence on the part of any servant or foreman of the master. The assertion

of liability is placed squarely upon the contention that the system or method of doing the work was unreasonably dangerous, and that the master should have amended his system or method so as to more adequately provide against the danger which produced the injury and death in this case. Appellant says that the master should have furnished or used a turntable for the trucks at the concrete mixer, so that the trucks could always be driven forward, or else a watchman should have been provided whose sole duty it would have been to go in advance of each truck as it backed down to the mixer.

In a recent case, Brown v. Coley, 168 Miss. 778, 152 So. 61, we had occasion to re-examine the question as to when and under what circumstances a master is required to take care to establish a safety system or method of doing the work and to promulgate and enforce rules for the observance of the system or method; and, on the authority of Tatum v. Crabtree, 130 Miss. 462, 94 So. 449, we held that the obligation of the master in that respect applies only when, in addition to being dangerous, the work is complex, and the conditions which may arise are uncertain and obscure. There was no obscurity in the way the work was done here; everything was done in daylight, and every movement made was in the plain and unobstructed view of everybody thereabout; there were no hidden or unknown or nonobvious dangers; nor was there, within a reasonable interpretation of the rule, any uncertainties about the operation. The trucks, blowing their horns, backed down to the mixer at regular intervals of about one and a fourth minutes apart and along a regular track on the right-hand side, looking towards the direction in which the truck was backing, as is required by the general law of the road. It is true that sometimes the trucks would become bunched, so that sometimes the intervals by which they backed would be more frequent than one and one-quarter minutes and sometimes less frequent; nevertheless, they were to be expected to pass

along that definite track at constantly recurring repetitions of very close frequency. There is thus presented a situation similar to that in Olsen v. Northern Pacific Lumber Co., 100 F. 384, 40 C. C. A. 427, cited with approval by our court in Tatum v. Crabtree, supra, and wherein the servant was injured by being struck by a sawmill carriage.

So it is that if any negligence may be ascribed to the master here because of the want of a better system or method, the oligation must be placed upon the view that the work, and the manner thereof, was complex; and, if we may assume for the sake of the argument, that this could be said of the situation here being examined, we come next to the fact, shown in this record practically without dispute, that the master here was using or following exactly the same system or method, in all respects, in doing this work that is being, and has been for some time, used and followed in the same business throughout the entire country. The rule is established practically without dissent that the master is not liable where he observes and follows the usual and customary method or system generally employed by careful and prudent men engaged in the same business, unless, as in Coast Ship Co. v. Yeager, 120 Miss. 152, 81 So. 797, the unreasonable unsafeness in the method or system is so evident that impartial persons could not well be in disagreement upon the issue. Mitchell v. Brooks, 165 Miss. 826, 147 So. 660; 39 C. J. 466, 467, and cases there cited.

But if we may pass that barrier in this case, we are finally confronted with the proposition that the master is not an insurer, and that his obligation is of reasonable care, from which it follows that he is not required to adopt unreasonable or impracticable means or methods or those which at last will not be effective, or, if effective, would be so only in a rare instance, and which, therefore, would be negligible in general results. And so we now more particularly examine the contentions of appellant

that a turntable should have been used or else that a watchman should have been provided. The testimony shows not only that a turntable is not used in this country in this work but that it is impracticable so to do, and this is manifest because of the weight and cumbersomeness of such a contrivance where it would be necessary to continually move it as the work progressed, together with the necessary approaches by which the trucks could get on it.

As to a watchman: These trucks had to back down from the turn in on an average of approximately four hundred feet, depending on the location of the mixer in relation to the turn in as the work progressed. Where should the watchman be stationed, and shall he shout his warnings or blow a horn or ring a bell? This would not be effective, for the proof shows that every truck was required to constantly blow its horn as it backed in, and that this was being done by the truck which struck the deceased; and the proof is further that a workman within ten feet of the deceased shouted to him three times to look out, to which the deceased paid no attention.

There is thus left the suggestion made by appellant that the watchman should run ahead of each truck and warn any who might be in the way. As already said, these trucks came in at intervals of one and one-fourth minutes. In order to go from the turn in and down the four hundred-foot average ahead of a truck to the mixer and back to the turn in for the next truck, a watchman would be required to travel eight hundred feet every minute and a quarter, or at the rate of more than seven miles an hour, which would be next to impossible. Evidently one such watchman or runner would not be sufficient, and, if not, how many more would be required? The testimony shows that only a few men were usually at work within the distance from the turn in to the mixer—on the occasion in question there were apparently only three—and the work of those therein was such that

they could stand up, face in the proper direction, and see at all times what was happening around them or about to happen. The work there did not require any such concentration of effort or attention or place them in such a position at any time that each of them was not reasonably able to take care of himself, and hence cases such as Gulf Refining Co. v. Ferrell, 165 Miss. 296, 147 So. 476, do not come into play. It must be a case of extra hazard and where, by the very nature of their work and of the situation in which they are placed, the workers cannot reasonably and fully take care of themselves that in respect to open and obvious dangers an industry or work is to be loaded with the expense and incumbrance of numerous watchmen, or even with any watchman at all. It is not to be permitted that the law in its endeavor to exact reasonable care on the part of the master shall itself be unreasonable or go to unreasonable extremes. All work around machinery is dangerous; it will always be so, and particularly where, as in road work, the place constantly shifts over changing and difficult grounds. The test is not danger but negligence, and negligence is the failure to take such reasonable care as is taken or should be taken by experienced and prudent men. The master, as it seems to us, had taken that care here and there is, therefore, no liability for the unfortunate injury.

Affirmed.