JEFFERSON *v.* VIRGINIA-CAROLINA CHEMICAL CO.

(Division A.    Dec. 12, 1938.)

[185 So. 230.    No. 33427.]

McClendon & Edmonds, of Jackson, for appellant.

Barnett, Jones & Barnett, of Jackson, for appellant.

Green, Green & Jackson, of Jackson, for appellee.

28

Argued orally by **Henry Edmonds** and **Ross R. Barnett**, for appellant, and by **Forrest B. Jackson**, for appellee.

**McGowen, J.**, delivered the opinion of the court.

This was a suit for personal injuries sustained by the appellant while engaged in his duties as servant of the appellee. At the close of appellant's evidence, the court below sustained a motion to exclude the evidence and

peremptorily instructed the jury to find a verdict for the appellee.

John Jefferson, a negro about forty years of age, had been employed by the Virginia-Carolina Chemical Company for about a week before he received the injuries complained of. He, with other employees, were engaged in loading an average box car with fertilizer. The operation of loading in itself was simple and not complex. The car was east of the platform from which the fertilizer was delivered into the car. The fertilizer was being transported in what is called a "Georgia Buggy" which is very similar to a wheelbarrow, except that the buggy has two metal wheels on the side and is deeper and larger than the ordinary wheelbarrow, with handles thereto. The load would be seven or eight hundred pounds, to be rolled by an employee from the machine to the platform, which was on a level with the machine, thence north on the platform where a steel apron four or five feet wide reached from the entrance to the platform. Neither the metal apron nor the door of the car would permit two of these buggies going in or out at the same time abreast. At the particular time, the fertilizer was being loaded in the north end of the car, which was shown to be very dark, and the only light was at the door. Jefferson had rolled his loaded buggy from the mixing machine to the platform, proceeding east, thence along the side of the car north, and as the front of his buggy was pushed at right angles into the car, an employee of the appellee ran his buggy into the left side of the buggy being pushed by Jefferson. That caused the handle of his buggy to be thrown violently against the facing of the car door and thereby he received injuries, the extent of which is unnecessary to be recounted.

The account of the injury is thus stated by him: "Well, I was going into the box car with the Georgia Buggy loaded, in a half trot, you know, and I was gwine in and another fellow was coming out, and as I started in his buggy struck the corner of mine and knocked my buggy

up in the door facing, and my hand got caught and hung in the door facing;'' that he did not know that the other fellow was in the box car at the time; he could not see in there; there was no warning of any kind to him; and that he and the other servant were going fast. That Mr. Calhoun, the man who hired and who fired the men and who was directing their work had told them to go fast and had given orders to the men going in and coming out that if they could not go fast to ''hit the clock,'' by which it was meant that they were discharged. He further said that frequently, and just prior to this accident, the men in his crew were ordered to go in a half trot, if they couldn't move fast to quit.

Wilbert, an employee, substantiated the statement of the appellant as to the injury, and as to how it occurred; also as to the general orders to hurry up given to the men.

West also substantiated the appellant's statement as to the circumstances of the injury. He further testified that prior to these hurry up orders by Calhoun that it had been the custom of the men theretofore to give the right of way to the employee going into a box car with a loaded buggy. In other words, those who were on the inside remained therein and let the man with the load get in before they undertook to come out. They did not work ''that way long,'' and ''the boss (Calhoun) told us to hurry up and keep going.'' They were told not to stop that way, and when they did stop and wait for another to come out, he (Calhoun) ''told them if they didn't quit stopping and get going, to hit the clock.'' These orders were given to the boys coming out. Calhoun had given this order to the witness about an hour and a half before the injury to Jefferson occurred.

On the facts, there is no question about Calhoun being the officer or agent of the company authorized to direct and control the servants in this operation, and there is no question but that the appellee is liable if it was negligent.

It is the argument of the appellee that the peremptory instruction was properly given because the work in which the appellant was engaged was simple, not complex, and that the servant was under the duty to exercise reasonable care for himself and not to expose himself to needless risks; and that the pushing of these loaded buggies into the car and the empties out of it was a simple operation, and whatever risk or hazard pertained thereto was assumed by the servant, that he did not use proper care for himself, therefore he cannot recover; that the operation was so simple as not to require rules or a warning under the circumstances, and that if there was any negligence it was that of the fellow servant who ran the buggy operated by him into that operated by appellant.

It is the contention of the appellant that the servants had adopted a simple effective way for their own safety in loading the car, by giving to the employee pushing the loaded buggy into the box car the right of way over the narrow metal passage, and those on the inside desiring to come out to wait until those having the right of way had entered the car with their load; that the master gave orders to the servant going into the car with loads and those coming out with unloaded buggies not to stop and wait, that if they did, they would be discharged. In other words, they were coerced into the abandonment of a safe method of loading the cars and forced to adopt an unsafe way by the direct orders of the master, without any warning or rule with respect thereto. The facts disclosed without controversy that one going into the box car could not see to the right or the left of the opening or door, five or six feet in width. It is likewise true that one coming out could not see until he reached a point beyond the line of light created by the open door. Negligence arises because of the master's having deprived the employees of their own adopted custom of a safe way to do the work by ordering them to proceed without stopping to await the coming in of the loaded

buggy; and the direct orders of the master, as though he were standing in person, supervising each operation created not only a place of danger, but a place he could reasonably foresee that some injury might result under the strict orders given by him. In other words, it is almost certain that any sensible man could see that a collision between the buggies going in and out would likely ensue. The order of the master here for haste on the part of the servants is not controlling. It is that order, plus the direct order of the master for those inside the car not to wait and give the right of way to those coming in with a loaded buggy, requiring its obedience or dismissal, without substituting some reasonable method by which an employee on the outside would be warned that another employee was coming from the inside.

In the case of Brown v. Coley, 168 Miss. 778, 779, 152 So. 61, 63, we said the master is liable where he "expressly and affirmatively order the servant to omit the safe method and to do the work in a dangerous way, he has waived, or rather has usurped, the duty otherwise resting on the servant and, to use a common term, he is estopped to assert that the duty to avoid the obvious danger was upon the servant, unless the danger is so imminent that no person of ordinary prudence should encounter it, even under orders."

In the case of McLemore v. Rogers, 169 Miss. 650, 152 So. 883, 884, this Court held that "where the master places his servant at a place and in a character of work which exposes the servant to hazards against which the servant cannot, by the use of due care, protect himself and at the same time do his work, the master must then take reasonable care to warn the servant or to erect guards, if either of these are reasonably practicable, and, if not, the master must so order and control the method of work as to obviate the danger, so far as reasonably practicable."

We think that under the principles above quoted that

the appellant had made a case which entitled him to go to the jury on the question of negligence.

That being true under our statutes, Section 513, Code of 1930, the appellant did not assume the risk, nor is the negligence of the fellow servant in obeying the direct order of the master to be charged to the servant so as to relieve the master who is negligent in the first instance. The negligence here charged to the master is that it ordered the particular work to be done in an unsafe and negligent manner and deprived the servant of the only means known to him to protect himself from injury.

We do not think the rule we have applied here conflicts with Tatum v. Crabtree, 130 Miss. 462, 94 So. 449, Hammontree v. Cobb Construction Company, 168 Miss. 844, 152 So. 279, and Vehicle Woodstock Company v. Bowles, 158 Miss. 346, 128 So. 98, 99. The negligence of the master here is that it ordered its servants to discontinue a safe simple way of taking care of themselves, and then provided no substitute for that safe way. The manner in which the master ordered this work done under the circumstances attendant thereon renders it liable for the natural and probable consequences of its direct orders carried out by the servant.

Reversed and remanded.